IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| FAIR ELECTIONS OHIO, *et al.*, | : | |
| | : | Case No. 1:12CV797 |
| Plaintiffs, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING PLAINTIFFS' |
| JON HUSTED, in his official capacity as | : | MOTION FOR TEMPORARY |
| Secretary of State of Ohio, *et al.*, | : | RESTRAINING ORDER |
| | : | |
| Defendants. | : | |

This matter comes before the Court on Plaintiffs' Motion for Temporary Restraining Order. (Doc. 2.) On Monday, October 15, 2012, Plaintiffs Fair Elections Ohio, The AMOS Project, Cure-Ohio, Central Ohio Advocates, and Community Re-Entry filed a Complaint for Declaratory and Injunctive Relief and Class Action (Doc. 1) and a Motion for Temporary Restraining Order (Doc. 2) against Defendants Jon Husted in his official capacity as Secretary of State of Ohio, Mike DeWine in his official capacity as Attorney General of Ohio, and Timothy M. Burke in his official capacity as Chair and member of the Hamilton County Board of Elections and on behalf of similarly situated chairs and members of the county boards of elections. Plaintiffs allege that Ohio law denies eligible electors who are jailed during the weekend prior to Election Day and who remain confined through Election Day the opportunity to vote by prohibiting them from applying for absentee ballots after noon on the Saturday before the election. As a result, Plaintiffs allege, Ohio law as applied by Defendants to newly jailed individuals violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution, the Voting Rights Act, and the Seventeenth Amendment. On

1

October 18, 2012, Plaintiffs filed an Amended Complaint adding five additional Chairs of various Ohio Boards of Elections as Defendants, naming all of them in their official capacities and on behalf of similarly situated chairs and members of county boards of elections.[1]  (Doc. 12.)

The Court held a hearing on Plaintiffs' Motion for Temporary Restraining Order on Tuesday, October 23, 2012.  For the reasons set forth below, the Court **DENIES** Plaintiffs' motion.

## I.     BACKGROUND

### A.     Ohio's Absentee Voting Procedures

During the last decade, in an attempt to prevent a reoccurrence of the long lines and wait times experienced at several polling locations during the 2004 general election, Ohio greatly expanded the availability of absentee voting.  In 2005, the State established no-fault absentee voting, extending that option to all registered electors, regardless of their actual availability to vote on Election Day.  *See Obama For America v. Husted*, Nos. 12–4055, 12–4076, 2012 WL 4753397, at *2 (6th Cir. Oct. 5, 2012) (citing 2005 Ohio Laws 40 (Sub. H.B. 234)).  The State also authorized in-person early voting, allowing any registered elector to cast an absentee ballot at the appropriate board of elections office through the Monday prior to the election.[2]  *See id.*

---

[1] The newly added Defendants are Virginia B. Grooms, Chair of the Adams County Board of Elections, David W. Ratliff, Chair of the Athens County Board of Elections, Frank Cloud, Chair of the Butler County Board of Elections, Douglas J. Preisse, Chair of the Franklin County Board of Elections, and Craig A. Allen, Chair of the Lawrence County Board of Elections.

[2] As discussed below, in 2011, Ohio amended its early voting laws to prohibit in-person early voting after 6:00 p.m. on the Friday before the election.  As a result of a judicial order issued in response to a challenge to that amendment, the Friday deadline will not be enforced during the upcoming election.

As a result of the changes to Ohio election law, registered electors now have three basic options for voting in Ohio: (1) they may vote in person at the elector's assigned polling place on the day of the election, pursuant to the procedures outlined in Ohio Revised Code Chapter 3505; (2) they may request and submit an absentee ballot by mail, pursuant to Ohio Revised Code Chapter 3509; or (3) they may request and vote an absentee ballot in person at the appropriate board of elections. As discussed below, Ohio law also establishes special absentee voting procedures for particular categories of individuals, namely disabled, ill, or infirm electors, electors confined in jail, electors hospitalized due to an unforeseeable medical emergency, military electors, and overseas electors. *See* Ohio Rev. Code § 3509.08 and Ch. 3511. This case primarily concerns the various deadlines imposed upon these special absentee voting procedures.

Section 3509.03 sets forth the general requirements and deadlines for applying for an absentee ballot. Pursuant to that section all absentee ballot requests sent in by mail must be received by the board of elections "not later than twelve noon of the third day before the day of the election at which the ballots are to be voted." Ohio Rev. Code § 3509.03. Accordingly, the general deadline to request an absentee ballot by mail for the upcoming November 6, 2012 election is Saturday, November 3 at noon. Section 3509.03 also establishes the deadline for in-person early voting. As described above, when the in-person early voting procedure was first established in 2005, the deadline set by the State was the close of business on the Monday prior to the election. In 2011, the State made a number of amendments to Ohio election law, one of which was to change the deadline for in-person early voting to 6:00 p.m. on the last Friday before the day of the election, as is currently reflected in § 3509.03. That statutory amendment

3

was the subject of a recent lawsuit before another Judge of this Court, wherein the Court found that the amendment likely violated the United States Constitution and enjoined the State from enforcing the Friday deadline. *See Obama For America v. Husted*, Case No. 2:12–CV–0636, 2012 WL 3765060 (S.D. Ohio Aug. 31, 2012), *aff'd*, 2012 WL 4753397 (6th Cir. Oct. 5, 2012). As a result, despite the language of the statute, during the upcoming election, registered electors will be permitted to cast an absentee ballot in person through Monday, November 5, 2012.

Recognizing that there are certain groups of registered electors who may require further assistance in casting a ballot, Ohio established additional mechanisms by which disabled, infirm, or otherwise confined voters may request assistance obtaining and, if necessary, filling out their absentee ballots, provided that they submit an application for an absentee ballot prior to noon on the Saturday before the election. Specifically, Ohio Revised Code § 3509.08(A) provides:

> Any qualified elector, who, on account of the elector's own personal illness, physical disability, or infirmity, or on account of the elector's confinement in a jail or workhouse under sentence for a misdemeanor or awaiting trial on a felony or misdemeanor, will be unable to travel from the elector's home or place of confinement to the voting booth in the elector's precinct on the day of any general, special, or primary election may make application in writing for an absent voter's ballot to the director of the board of elections of the elector's county. . . . The application shall not be valid if it is delivered to the director before the ninetieth day or *after twelve noon of the third day before the day of the election* at which the ballot is to be voted.

> The absent voter's ballot may be mailed directly to the applicant at the applicant's voting residence or place of confinement as stated in the applicant's application, or the board may designate two board employees belonging to the two major political parties for the purpose of delivering the ballot to the disabled or confined elector and returning it to the board, unless the applicant is confined to a public or private institution within the county, in which case the board shall designate two board employees belonging to the two major political parties for the purpose of delivering the ballot to the disabled or confined elector and returning it to the board. In all other instances, the ballot shall be returned to the office of the board in the manner prescribed in section 3509.05 of the Revised Code.

> Any disabled or confined elector who declares to the two board employees belonging to the two major political parties that the elector is unable to mark the elector's ballot by reason of physical infirmity that is apparent to the employees to be sufficient to incapacitate the voter from marking the elector's ballot properly, may receive, upon request, the assistance of the employees in marking the elector's ballot, and they shall thereafter give no information in regard to this matter. Such assistance shall not be rendered for any other cause. . . .

Ohio Rev. Code § 3509.08(A) (emphasis added). Subsection B of § 3509.08 provides another special procedure for electors who are unable to travel to their polling locations on the day of the election due to their own or their child's emergency hospitalization. Electors falling within that category may request an absentee ballot until 3:00 p.m. on the day of the election:

> (1) Any qualified elector who is unable to travel to the voting booth in the elector's precinct on the day of any general, special, or primary election may apply to the director of the board of elections of the county where the elector is a qualified elector to vote in the election by absent voter's ballot if either of the following apply:
>
>> (a) The elector is confined in a hospital as a result of an accident or unforeseeable medical emergency occurring before the election;
>>
>> (b) The elector's minor child is confined in a hospital as a result of an accident or unforeseeable medical emergency occurring before the election.
>
> (2) The application authorized under division (B)(1) of this section shall be made in writing, shall include all of the information required under section 3509.03 of the Revised Code, and *shall be delivered to the director not later than three p.m. on the day of the election*. The application shall indicate the hospital where the applicant or the applicant's child is confined, the date of the applicant's or the applicant's child's admission to the hospital, and the offices for which the applicant is qualified to vote. The applicant may also request that a member of the applicant's family, as listed in section 3509.05 of the Revised Code, deliver the absent voter's ballot to the applicant. The director, after establishing to the director's satisfaction the validity of the circumstances claimed by the applicant, shall supply an absent voter's ballot to be delivered to the applicant. *When the applicant or the applicant's child is in a hospital in the county where the applicant is a qualified elector and no request is made for a member of the family to deliver the ballot, the director shall arrange for the delivery of an absent voter's ballot to the applicant, and for its return to the office of the board, by two*

> *board employees belonging to the two major political parties according to the procedures prescribed in division (A) of this section.* When the applicant or the applicant's child is in a hospital outside the county where the applicant is a qualified elector and no request is made for a member of the family to deliver the ballot, the director shall arrange for the delivery of an absent voter's ballot to the applicant by mail, and the ballot shall be returned to the office of the board in the manner prescribed in section 3509.05 of the Revised Code.

Ohio Rev. Code § 3509.08(A) (emphasis added). Section 3509.08 concludes by providing that "[a]ny qualified elector described in (A) or (B)(1) of this section who needs no assistance to vote or to return absent voter's ballots to the board of elections may [alternatively] apply for absent voter's ballots under" the general procedures outlined in section 3509.03, as described above. Ohio Rev. Code § 3509.08(C).

Plaintiffs in this case are concerned with the apparent absence of any option to vote by absentee ballot for registered electors who may be arrested on or after the Friday evening before Election Day and who remain in detention through the election. Individuals arrested and detained prior to that Friday evening may request an absentee ballot under either § 3509.03 or § 3509.08. However, Plaintiffs allege, individuals arrested after Friday at 6:00 p.m. and detained through the election will have no means to vote as they would be unable to meet the Saturday noon deadline for delivery of an absentee ballot request to the board of elections and there is no provision of in-person voting for people in detention. According to Plaintiffs, the State has violated federal law and the United States Constitution by failing to provide those individuals with at least the same accommodations as are provided to individuals suffering from an unforeseen medical emergency requiring hospitalization under Ohio Revised Code § 3509.08(B).

Much of the testimony elicited at the preliminary injunction hearing dealt with the procedures employed by several Ohio counties to respond to requests for absentee ballots by

electors confined in nursing homes, hospitals, and jails.  Plaintiff's first witness was Mary

Fannin, Director of the Adams County Board of Elections (hereinafter the "Adams County

Board" or the "Board").  Ms. Fannin has been employed by the Adams County Board in various

capacities for fifteen years.  The Adams County Board is the smallest of the Boards that were

represented during the hearing.  The Board employs only two full-time staff – the Director and

Deputy Director – and one temporary part-time clerk, who is brought on during the election

season.  Ms. Fannin testified that during the busy two-week period prior to the election, she and

her staff work "to capacity."  (TRO Hr'g Tr. 37:14-16, Doc. 23 at 37, Pg. ID # 236.)   As

Director of the Board, Ms. Fannin is responsible for overseeing all aspects of the election,

including counting, verifying, and scanning absentee ballots, facilitating in-person early voting,

setting up polling locations for the day of the election, coordinating and managing poll workers,

and assisting voters confined to nursing homes and jails.

As indicated above, Ms. Fannin's duties include fulfilling requests for absentee ballots

both via the mail and in person.  With regard to the general procedures for absentee voting, the

Board accepts absentee ballot applications delivered via the mail until noon on the Saturday

prior to the election.  During this election season, pursuant to an order of the Ohio Secretary of

State issued as a result of the recent litigation involving in-person voting during the weekend

prior to the election, the Board will remain open for in-person voting on Saturday, November 3,

from 8:00 a.m. to 2:00 p.m., Sunday, November 4, from 1:00 p.m. to 5:00 p.m., and Monday,

November 5, from 8:00 a.m. to 2:00 p.m.  When a request for absentee ballot is received, either

by mail or in person, the Board verifies that the individual requesting the ballot is registered by

checking the registration rolls.  The Board then also verifies the elector's ID (or driver's license

number or last four digits of the elector's social security number if the request is made by mail) and signature before issuing the requested absentee ballot.  According to Ms. Fannin, the process for verifying that information "doesn't take very long.  Five, ten minutes, probably not that long."  (TRO Hr'g Tr. 29:4-5, Doc. 23 at 29, Pg. ID # 228.)

With regard to confined voters, Ms. Fannin testified that the Adams County Board typically receives applications for absentee ballots from nursing home residents.  The Board fulfills those requests received prior to the noon Saturday deadline by sending two employees, one Republican and one Democrat, to the nursing homes to assist those electors in voting and returning their absentee ballots.  Ms. Fannin testified that there are two women whom the Board hires during election season solely to fulfill nursing home ballot requests.  Absentee ballot requests from jailed individuals are treated in the same manner generally.  As long as the Board receives those requests prior to the noon Saturday deadline, two employees will be sent to the jail to deliver and return the ballots.  Ms. Fannin testified that to the best of her knowledge, during the fifteen years she has worked for the Adams County Board, the Board has never received an absentee ballot request after the Saturday deadline from an individual who was jailed during the weekend prior to the election and detained through the day of the election.  She also stated that she is unaware of anyone ever transporting a jailed individual to the Board office to vote in person prior to the election.

When asked how the Adams County Board deals with requests made by hospitalized electors pursuant to Ohio Revised Code § 3509.08(B), Ms. Fannin testified that as long as it receives the elector's application prior to 3:00 p.m. on the day of the election and the elector is within Adams County, the Board sends two employees or members of the Board to the hospital

8

who deliver the ballot, wait while the elector completes the ballot, and then return the ballot to the Board. Only members or employees of the boards of elections, and in some circumstances family members of electors, not volunteers, are permitted to deliver absentee ballots under § 3508.08. Because the Adams County Board only employs three people, when § 3509.08(B) requests are made on the day of the election, the Board often sends two board members rather than employees to fulfill those requests because the board employees are busy dealing with other aspects of the election. If the elector is confined at a hospital outside of Adams County, the Board is not under any duty to deliver an absentee ballot, but the elector can direct a family member to pick up the absentee ballot from the Adams County Board of Elections office and then return the ballot after the elector has completed it.

After calling Ms. Fannin to testify, Plaintiffs called Todd Wedekind, who has served as the Manager of Absentee Voting for the Franklin County Board of Elections since 2005. The Franklin County Board of Elections (hereinafter the "Franklin County Board" or the "Board") is much larger than the Adams County Board. The absentee voter department alone employs five full-time employees and approximately eighty-five to ninety seasonal employees. As the Manager of Absentee Voting, Mr. Wedekind oversees all aspects of absentee voting, whether in person or by mail, in Franklin County. Mr. Wedekind described the absentee voting process as "quite an undertaking." (TRO Hr'g Tr. 47:11, Doc. 23 at 47, Pg. ID # 246.) As of October 22, 2012, the Franklin County Board had sent 160,000 absentee ballots to electors, and approximately 21,000 people had voted in person at the Board.

Mr. Wedekind described various methods for requesting an absentee ballot. Electors can fill out a Form 11-A to make a general request for an absentee ballot. There also are more

particularized forms for certain categories of people such as military and overseas voters. As to disabled or otherwise confined voters, the Franklin County Board employs a similar procedure to assist both nursing homes and jails with absentee ballot requests made by their charges. About one month prior to the start of absentee voting, the Board sends a packet to the social worker at each of the two county jails. The packet contains registration forms, general absentee ballot request forms (Form 11-A), and instructions. Detained registered electors can request to have absentee ballots mailed or delivered to them at the jail. Typically, on the Monday of the week prior to the election – this year, Monday, October 29, 2012 – Board employees collect the requests they have received thus far and deliver the ballots to the two jails. The following day, Board employees return to the jails to retrieve the completed ballots. If the Board receives any additional Form 11-A requests from jailed individuals between that time and the noon Saturday deadline, the Board responds to those requests by mailing an absentee ballot to the address requested by the individual. Alternatively, if during that time period a jailed individual specifically requests delivery of an absentee ballot by submitting a Form 11-F, the form used by a voter making a request for assistance under § 3509.08(A), the Board would send employees to the jail to deliver the ballot.

As to the manner in which the Franklin County Board addresses § 3509.08(B) requests from individualized hospitalized due to medical emergencies, Mr. Wedekind testified that during the week prior to the day of the election the Board sends a letter to patient relation coordinators at the hospitals[3] describing the process by which people who are hospitalized or who are the parents of a minor child who is hospitalized due to an unforeseen medical emergency can request

_____

[3] Mr. Wedekind testified that there are over twenty hospitals in Franklin County.

an absentee ballot. The Board attaches to that letter the corresponding request form (Form 11-B) and provides a fax number to which the hospitals may fax those forms. The Board begins to collect the request forms during the weekend prior to the election so that they can get an idea of how many requests they are likely to get and how many employees they will need to deploy to fulfill those requests. Then, on Election Day, the Board sends a designated number of employees out to the hospitals to deliver the requested absentee ballots. For the upcoming election, Mr. Wedekind expects to assign sixteen seasonal employees to carry out that task. Typically, the Board sends those employees out in the morning rather than waiting for the 3:00 p.m. deadline. If more requests come in later in the day, the Board sends employees out again to fulfill those requests as long as they are made prior to 3:00 p.m. In fact, Mr. Wedekind stated, it is likely that Board employees will have to make at least two trips to each hospital on Election Day.

During his testimony, Mr. Wedekind confirmed that these procedures resulted from several months of planning. When asked whether it would be difficult to develop and implement new procedures during the two weeks prior to the election, he stated that the level of difficulty would depend on the situation.

In testifying about Butler County's approach to absentee ballots, Lynn Edward Kinkaid, the Director of the Butler County Board of Elections, described similar procedures as those employed by the Franklin County Board. The Butler County Board of Elections (hereinafter the "Butler County Board" or the "Board") employs twenty-six full-time staff, and during the election season, the Board hires a number of part-time seasonal employees. This year, not counting the people hired to work the polls on Election Day, Mr. Kinkaid believes the Board will

11

employ a total of approximately 114 people on a part-time seasonal basis.  Since the start of the early voting period this year, the Butler County Board has received thousands of requests for absentee ballots.  According to Mr. Kinkaid, as soon as the Board receives a request, it is processed and verified.  Typically, the Board is able to mail the absentee ballot form to the elector within one day of receiving the request.  The Butler County Board's Election Administration Plan indicates that one employee is expected to be able to process forty absentee ballot applications per hour.  (*See* Pl. Ex. 20.)   As absentee ballots are returned, the Board expects its employees to be able to process approximately 100 ballots each per hour.  (*See id*.)

The procedure employed by the Butler County Board with regard to § 3509.08(B) absentee ballot requests is not materially different from that employed by the Franklin County Board.

As to jailed individuals, Mr. Kinkaid testified that the Butler County Board's Early Voting Managers send a letter to the jail advising them of the steps inmates must take to request an absentee ballot.  Mr. Kinkaid was not entirely familiar with the manner in which the Butler County Board deals with those requests, but he stated that the Board would schedule a specific time for employees to go to the jail to assist inmates with voting.

Nick Fisher, the Jail Warden for the Butler County Sheriff's Office, was able to shed greater light on that process.  There are four basic types of jails in Ohio: full-service jails, twelve-day facilities, twelve-hour facilities, and temporary holding facilities.  According to Mr. Fisher, Butler County operates two full-service jails, which are less than a mile apart.  The City of Middletown, in Butler County, also has a full-service jail, and there are temporary holding facilities in Hamilton, Oxford, Fairfield, and West Chester.  On any given day, there are

approximately 850 to 900 inmates housed in the two Butler County jails. Those inmates may include federal prisoners, Immigration and Custom Enforcement prisoners, and prisoners of other Ohio counties and municipalities who have contracted with Butler County to house their prisoners. To the extent that any of those inmates are registered to vote in Butler County, they can request an absentee ballot by making an inmate service request.[4] After making such a request, the inmate is given a "preapplication ballot." (TRO Hr'g Tr. 143:9, Doc. 24 at 20, Pg. ID # 342.) At some point prior to the election, the jail collects all of the completed preapplication ballots and transmits them to the Butler County Board. The Board then processes those applications, verifies that each applicant is a registered elector, and then coordinates with employees of the jail to select a time for Board employees to visit the jails so that the inmates may complete their absentee ballots. This year, the Butler County Board is planning to send employees to the jails on Friday, November 2, 2012. As far as Mr. Fisher knows, that is the only visit scheduled at this time. However, in the event an inmate requests an absentee ballot after that visit, the jail will forward the request to the Butler County Board, and if the Board needs to send employees back to the jail to fulfill the request, such a visit can be arranged.

Mr. Fisher testified that due to security concerns and logistical issues he would need at least one or two days advance notice in order to arrange such a visit. During the visits, the jail has to provide security not only for the Board employees, but also the detainees. Depending on the numbers of inmates wishing to vote, the jail has to determine the best location, typically an interview room in the jail, to station the Board employees. Once the Board employees arrive at the jail and are escorted to that pre-determined location, inmates are brought in one at a time to

---

[4] A particular sergeant has been assigned to process those requests.

13

fill out their absentee ballots. To facilitate this, the jail may have to move certain inmates in advance of the visit or "lock down" certain inmates so that others may vote. The jail also has to ensure that the inmates wishing to vote are not sent out on work assignments or transferred to a court or another detention facility on the date of the visit. For that reason, the jail needs advance notice not only of the date and time of the visit, but also of which inmates are planning to vote.

The last witness to testify about absentee ballot procedures was Sally Krisel, the Deputy Director of the Hamilton County Board of Elections (hereinafter the "Hamilton County Board" or the "Board"). Ms. Krisel has worked for the Hamilton County Board since 1999. She worked in the absentee voter department until 2008, when she was appointed as Director of the Board. She served as Director from 2008 to earlier this year, when she took the role of Deputy Director. The Hamilton County Board employs forty full-time staff and approximately eighty to eighty-five seasonal employees. With regard to the manner in which the Board deals with various types of absentee ballot requests, Ms. Krisel described procedures similar to those described by Franklin and Butler Counties. The only material difference in her testimony was that during the 2008 election, the Hamilton County Board received one request for an absentee ballot from the spouse of a person detained in the Hamilton County Justice Center after the Saturday deadline for such requests. On that occasion, the Board processed the request and issued an absentee ballot. Ms. Krisel was not involved in the decision to issue that ballot. As to the upcoming election, Ms. Krisel at one point testified that she was not sure how the Board would deal with any similar requests. Later during her testimony, however, she confirmed that inmates who do not meet the noon Saturday deadline will not be permitted to vote by absentee ballot.

14

**B.  Evidence Pertaining to the Potential Number of Inmates Who Will Be Prevented From Voting if Arrested During the Weekend Prior to the Election**

In addition to the witnesses discussed above, Plaintiffs also called Jorge Dalence-Gastelu, a program associate with the Ohio Justice and Policy Center's Race and Justice Project.[5]  After filing this lawsuit, attorneys from the Ohio Justice and Policy Center asked Mr. Dalence-Gastelu to research the potential number of registered electors detained in Ohio's jails during any given period.  Mr. Dalence-Gastelu's research primarily consisted of a comparison between the registered voter rolls and the jail rosters in two counties in Ohio.

With regard to Hamilton County, Mr. Dalence-Gastelu obtained from the Hamilton County Sheriff's Department website a list of individuals, 1,399 in total, under detention in Hamilton County as of Wednesday, October 17, 2012 at 5:00 p.m.  (*See* Pl. Ex. 23.[6])  Mr. Dalence-Gastelu then compared that list to the Hamilton County Board of Elections' list of registered voters, which he obtained from the Board's website.  Due to time constraints, Mr. Dalence-Gastelu was only able to compare a portion of the inmates, who are listed in alphabetical order.  Mr. Dalence-Gastelu stated that he simply started from the top of the list, with inmates whose last names started with A, and worked his way toward the middle of the list.

---

[5]  Attorneys from the Ohio Justice and Policy Center represent Plaintiffs in this case.  The Center's Race and Justice Project was mistakenly referred to as the "Raising Justice Project" in the hearing transcript.  (TRO Hr'g Tr. 169:5, Doc. 24 at 46, Pg. ID # 368.)

[6]  Plaintiffs' Exhibit 23 is a document titled "Hamilton County Inmate Roster 10/17/12."  It is not an official document, but rather a list created by Mr. Dalence-Gastelu based on information pulled from the Hamilton County Sheriff's Department website.  The document contains a list of inmates and provides the following information for each inmate: name, JMS number, date of admission, date of projected release (if available), and active holder status.  The document does not list any other identifying information, but Mr. Dalence-Gastelu testified that by clicking on an inmate's name at the website, he was able to pull up more information, including the inmate's date of birth.

In total, he checked approximately the first 330 inmates against the list of registered voters, and he found that more than fifty of the inmates were also listed on the voter rolls. Of that group of 330 inmates, Mr. Dalence-Gastelu then looked specifically at the number of inmates arrested between Friday, October 12, 2012 and Tuesday, October 16, 2012 – a time period similar to the time period prior to the election during which Plaintiffs allege inmates will be unable to vote – and found that of forty-seven individuals arrested during that period, twenty-one of the individuals were registered to vote.

Mr. Dalence-Gastelu undertook a similar investigation into the potential number of registered voters detained in Franklin County. With regard to Franklin County, Mr. Dalence-Gastelu was unable to obtain a complete inmate list, but he did obtain a list of inmates who were booked into jail on October 16, 2012. (*See* Pl. Ex. 24.[7]) Mr. Dalence-Gastelu compared that list to the Franklin County Board of Elections' list of registered voters, which he found on the Board's website. Of the seventy-nine people listed as being booked into jail on October 16, 2012, thirty-five were registered to vote.

Based on the above analysis, Mr. Dalence-Gastelu determined that in both Hamilton County and Franklin County, roughly forty-four percent of the inmates examined were registered to vote. Mr. Dalence-Gastelu did not know how many of those registered voters had already voted or requested absentee ballots. Nor did he know how many of them would be released prior to the election.

---

[7] Plaintiff's Exhibit 24 is an untitled list of names that appears to show an address and date of birth next to each name. The document was obtained by Jennifer Brunner, one of the witnesses and Plaintiff representatives in this case, in response to a public records request that she lodged with the Franklin County Sheriff's Office. The document was sent via email to her by Chief Deputy Mark Barrett. (*See* Pl. Ex. 26.)

**C.    Evidence Pertaining to the Alleged Harm Suffered By Plaintiffs Fair Elections Ohio and The AMOS Project**

Plaintiffs called two witnesses to testify as representatives of two of the Plaintiff organizations.  The first, Paul Graham, testified on behalf of The AMOS Project ("AMOS").  Mr. Graham has served as the Executive Director of AMOS since January of 2010.   AMOS is a federation of churches in the greater Cincinnati area that work together to address local economic and social issues.  The organization is currently made up of twenty-two member churches, which pay dues based on the size of their congregations.  The total number of people in those congregations is approximately 10,000 to 15,000.  The member churches come from all areas of Cincinnati and vary from "wealthy predominantly white churches like Hyde Park Community United Methodist Church" to "low-income black churches that are small, 50 to a hundred people, in urban parts of Cincinnati" to "suburban congregations like Macedonia Living Word which is . . . a small African-American church in Springdale."  (TRO Hr'g Tr. 69:13–19, Doc. 23 at 69, Pg. ID # 268.)  Despite the large number of congregants in AMOS's member churches, Mr. Graham described AMOS as being a small organization, with a full-time staff of only two people and an annual operating budget of $150,000.  Nine people currently sit on the Board of Directors, at least half of whom are low income-earning.

During the past two years, AMOS has taken a more systematic approach to addressing "issues of racial injustice and racial inequality," including "issues of voting rights or the job market or en masse incarceration."  (*Id*. at 70:13–16, Doc. 23 at 70, Pg. ID # 269.)  One facet of that new approach has been to focus on voter engagement.  Accordingly, during the past several months, AMOS's team of volunteers has helped to register approximately 6,000 new voters, primarily in low-income neighborhoods in Hamilton County where voter turn out tends to be

low.  Presently, AMOS has shifted its focus to encouraging people to vote early and to educating people as to the various voting options available to them.  Combined, those efforts currently consume about ninety percent of AMOS's resources in time and money.  Mr. Graham estimated that over the course of the past few months, the organization has devoted approximately $40,000 to election-related projects.  That figure includes the salaries of the two paid staff.  Also included in the figure is the approximately $2,000 to $3,000 that the organization spent on publications containing information on voting.

Mr. Graham testified that he was not aware of the impact that the current absentee ballot deadlines may have on people arrested during the weekend prior to the election until October of this year.  As the election approached, The AMOS Projects' member churches and their congregants expressed increasing concern about this issue.  According to Mr. Graham, the member churches, and their respective congregations, include individuals who have had  prior experience with the criminal justice system.  Two member churches have significant ministries that both incorporate and assist individuals returning to the general population after periods of incarceration, and these ministries have supplied numerous volunteers for AMOS's voter engagement projects.  Mr. Graham also testified that "[b]eing arrested is, . . . unfortunately, a common thing in some of the neighborhoods where our congregations are."  (TRO Hr'g Tr. 87:18–19, Doc. 23 at 87, Pg. ID # 286.)

When asked about the injury AMOS would suffer if the requested relief is not granted, Mr. Graham testified that his organization will have to devote resources to printing new materials and to retraining volunteers to advise them of the deadlines.  He also testified that AMOS' "mission as an organization" is harmed when people are not permitted to exercise their

18

right to vote.  As of the hearing in this case, the organization had not yet altered its volunteer training or made changes to its publications to add new information related to the issues raised in this suit.  He was not sure when those changes would be made or what they might entail, but he suggested that they would likely have to advise people that they may not be able to vote if they are arrested during the weekend prior to the election.  He also stated that regardless of the outcome of this suit, his organization still would encourage its constituents to vote early, a project that has been referred to as "Souls to the Polls."

The second party representative called by Plaintiffs was Jennifer Brunner, who testified based on her experience as the former Ohio Secretary of State and as representative of Plaintiff Fair Elections Ohio ("FEO").  Ms. Brunner, an attorney, served as the Ohio Secretary of State from January 2007 to January 2011 and currently is a partner at the Columbus, Ohio law firm of Brunner Quinn.  As result of her past service as Secretary of State, Ms. Brunner has been aware for the past several years of Ohio's absentee voting deadlines, including the difference in the ballot request deadlines imposed on prisoners versus individuals who are hospitalized due to an unforeseeable medical emergency.  In fact, she enforced those deadlines when she served as Secretary of State, though she claims she did so only because she was bound to follow the laws of the State.

In the last two years, since leaving office, Ms. Brunner became the co-chair of FEO, an organization that is both a non-profit corporation organized under the State of Ohio and a political action committee registered with the Secretary of State.  As to the organization's mission, Ms. Brunner stated that FEO was formed for the twin purposes of ensuring fair election policies and access to voting and of protecting the integrity of the election process.  Since its

19

formation, FEO's primary goal has been to fight the State's effort to reduce the early voting period from thirty-five to twenty-one days. This Court need not go into the details of that battle for the purpose of this Order. It is sufficient to note that FEO has filed a separate lawsuit against Defendant Husted to address that issue. *See Fair Elections Ohio v. Husted*, Case No. 2:12-cv-00763-GCS-MRA (S.D. Ohio).

In addition to fighting any reduction to the number of early voting days, FEO also has been particularly concerned with ensuring that electors are able to vote during the weekend prior to the election. As indicated above, that issue was the subject of yet another recent lawsuit, which has resulted in an order requiring the State to permit early in-person voting at the boards of elections through Monday, November 5, 2012.

When asked how the current deadline for incarcerated individuals to request absentee ballots will harm FEO, Ms. Brunner responded as follows:

> Well, it hurts Fair Elections Ohio because, with all of the people who have participated in our effort who considered themselves supporters and members and parts of our coalition and members of the organizations who were in our coalition, we don't know – basically any one of them could be subject to the problems that this law creates, which is they could be arrested by mistake, they could be arrested for something that gave an officer probable cause, and they could be put in jail and they could be denied their rights to vote when they actually were supporting us for the purposes of creating fair voting rights in the state of Ohio.

(TRO Hr'g Tr. 214:23–215:8, Doc. 24 at 91–92, Pg. ID # 413–414.) Aside from the resources that FEO has put into the current lawsuit, Ms. Brunner could not describe any additional resources that FEO has devoted or plans to devote to addressing the issue of prisoners' inability to request an absentee ballot during the weekend prior to the election.

20

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the Court to grant preliminary injunctive relief. A district court is to consider the following four factors when deciding to issue a preliminary injunction: (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of preliminary injunctive relief. *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *see also Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). "[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied. . . . These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Pitcher Industries, Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citations omitted).

## III.   ANALYSIS

### A.    Standing

Prior to considering the factors described above, the Court must, as an initial matter, address Defendants' challenge to Plaintiffs' standing to bring this lawsuit. A plaintiff seeking to invoke the jurisdiction of the federal courts "must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "The irreducible constitutional minimum of standing contains three requirements[:] . . . injury in fact, causation, and redressability." *Nader v. Blackwell*, 545 F.3d 459, 471 (6th Cir. 2008) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–03 (1998)). "[I]njury in fact [is] a harm suffered by the plaintiff that is concrete and actual

or imminent, not conjectural or hypothetical." *Steel Co.*, 523 U.S. at 103 (citation and quotation marks omitted). Causation may be demonstrated by showing "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Id.* Redressability is "a likelihood that the requested relief will redress the alleged injury." *Id.*

Plaintiffs in this case are not registered electors at risk of being arrested and detained during the weekend prior to the election. Rather, they are non-profit organizations and associations who share common goals of advocating for fair elections and equitable voting opportunities, encouraging voting, and protecting the rights of prisoners. Those common goals, however, are insufficient in and of themselves to confer standing. *See Northeast Ohio Coal. for the Homeless v. Brunner*, No. C2-06-896, 2008 WL 4449514, at *4 (S.D. Ohio Sept. 30, 2008) ("A mere interest in a problem . . . is insufficient to confer standing on an organization."). Organizations such as Plaintiffs in this case may claim standing based on their own injury ("independent standing") or based on injury to their members ("organizational standing"). *See id.* at *3.

With regard to AMOS, Plaintiffs allege that the absentee ballot application deadline applicable to prisoners exposes AMOS to two distinct forms of independent injury. First, Plaintiffs allege, AMOS will have to divert resources away from getting out the vote throughout all of its members' neighborhoods and devote those resources instead to (a) providing additional training for canvassers regarding the effect of arrest, (b) increasing concentration in the neighborhoods where congregation members are most at risk of arrest, and (c) actually informing voters in those at-risk areas that if they do not take advantage of early voting options and are arrested and detained during the weekend prior to the election, they may not be able to vote.

22

Second, fulfillment of AMOS's mission will be impaired when electors it has registered and electors in its member congregations are prevented from actually voting.[8]

Actionable injury can consist of "actual present harm or a significant possibility of future harm." *Thomas More Law Center v. Obama*, 651 F.3d 529, 535 (6th Cir. 2011). Whether actual or imminent, the injury alleged by a plaintiff organization must be greater than a mere "setback to the organization's abstract social interests." *Northeast Ohio Coal. for the Homeless*, 2008 WL 4449514, at *4 (quoting *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (internal quotation marks omitted)).

The second injury claimed by AMOS is little more than an alleged impairment to the organization's social interest in encouraging civic engagement through voter participation, and therefore is not the type of palpable harm that would constitute an actionable injury. *See id.* at *4 (characterizing the plaintiff organization's claim that the challenged voter identification law had harmed and would continue to harm the organization's ability to carry out its goal of reducing barriers to homeless peoples' ability to vote as "merely a frustration of [the organization's] social interest in having homeless people vote," and rejecting the plaintiff's assertion that the described harm was sufficient to establish standing).

In contrast, the first injury described by Plaintiffs – the diversion of resources – is sufficient to establish standing. One of the ways an organization can show actionable injury is to demonstrate that "a statute compel[s] it to divert more resources to accomplishing its goals." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (internal quotation omitted) (finding that a Florida voter registration law was subject to challenge

---

[8] Plaintiffs also allege that this will impair AMOS's ability to raise funds for future work; however, no testimony or other evidence supports that allegation.

by three nonprofit organizations whose missions included increasing voter registration and participation among members of racial and ethnic minority communities where each plaintiff showed that it would "have to divert personnel and time to educating volunteers and voters on compliance with [the challenged law] and to resolving the problem of voters left off the registration rolls on election day," at the expense of other priorities); *see also Northeast Ohio Coal. for the Homeless*, 2008 WL 4449514, at *4 (suggesting that the plaintiff may have been able to establish standing if it had demonstrated that the challenged voter identification law had caused the plaintiff to expend additional resources to encourage homeless people to vote); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (finding that the Democratic Party had standing to challenge a voter identification law that "compell[ed] the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"). "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Crawford*, 472 F.3d at 951. In the instant case, the evidence supports Plaintiffs' claim that AMOS will be required to divert its resources to retraining its volunteers and informing its members and constituents of the risks attendant with getting arrested during the weekend prior to the election. That injury, however small in scale, is sufficient to establish standing – it is imminent, fairly concrete, is traceable to the challenged absentee ballot deadline, and is redressable.

Because the Court has determined that AMOS has standing to sue on its own behalf, the Court need not consider whether it would have standing to sue on its members' behalf. Furthermore, the presence of one party with standing is sufficient to provide jurisdiction over the

case.  *ACLU v. Grayson Cnty.*, 591 F.3d 837, 843–44 (6th Cir. 2010).  Accordingly, the Court

need not at this time consider FEO's independent standing, and the Court instead turns to the

factors that must be weighed when evaluating a request for injunctive relief.

> **B.**      **Likelihood of Success on the Merits**

When a party seeks injunctive relief on the basis of a potential constitutional violation, as

Plaintiffs do here, "the likelihood of success on the merits often will be the determinative

factor."  *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).          Plaintiffs argue that they

have demonstrated a likelihood of success with regard to all of their claims, though they focus

primarily on their equal protection claims.

> **1.**      **Equal Protection**

The right to vote has long been accorded "the most fundamental significance under our

constitutional structure."  *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184

(1979).  However, "the Constitution provides that States may prescribe '[t]he Times, Places and

Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, and the [United

States Supreme] Court therefore has recognized that States retain the power to regulate their own

elections."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing *Sugarman v. Dougall*, 413 U.S.

634, 647 (1973) and *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986)).

Indeed, the Supreme Court has cautioned that "[c]ommon sense, as well as constitutional law,

compels the conclusion that government must play an active role in structuring elections; 'as a

practical matter, there must be a substantial regulation of elections if they are to be fair and

honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'"

*Id.* (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Although the State has the power to regulate the administration of elections, that power does not excuse the State from the Fourteenth Amendment's requirement that states take no action resulting in the denial of the equal protection of the laws. "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Accordingly, the State may not, "by . . . arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000).

### a. The Applicable Standard

The Sixth Circuit recently described the various standards that apply to equal protection challenges involving the right to vote as follows:

> The Equal Protection Clause applies when a state either classifies voters in disparate ways, *see Bush*, 531 U.S. at 104–05 (arbitrary and disparate treatment of votes violates equal protection), or places restrictions on the right to vote, *see* [*League of Women Voters v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008)] (voting system that burdens the exercise of the right to vote violates equal protection). The precise character of the state's action and the nature of the burden on voters will determine the appropriate equal protection standard. *See Biener v. Cailo*, 361 F.3d 206, 214 (3d Cir. 2004) ("The scrutiny test depends on the [regulation's] effect on [the plaintiff's] rights.").

> If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807–09 (1969) (applying rational basis to a state statute that prohibited plaintiffs' access to absentee ballots where no burden on the right to vote was shown); *Biener*, 361 F.3d at 214–15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote"). On the other extreme, when a state's classification "severely" burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard. [*Burdick*, 504 U.S. at 434]; see also [*Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)] ("We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").

Most cases fall in between these two extremes. When a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, we review the claim using the "flexible standard" outlined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See* [*Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 238 (6th Cir. 2011)] (applying *Anderson–Burdick* balancing in an equal protection challenge to the counting of provisional ballots). Although *Anderson* and *Burdick* were both ballot-access cases, the Supreme Court has confirmed their vitality in a much broader range of voting rights contexts. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (Scalia, J., concurring.) ("To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick* . . . ."). The *Burdick* Court stated the standard as follows:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789)). This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote. There is no "litmus test" to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and "make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190 (Stevens, J., announcing the judgment of the Court).

*Obama For America*, 2012 WL 4753397, at *4–5.

Relying primarily on *McDonald*, 394 U.S. 802, Defendants argue that Plaintiffs' equal protection claim should be analyzed under the lowest level of scrutiny because Plaintiffs have not actually pleaded or proved that individuals arrested during the weekend prior to the election will have no opportunity to vote unless the State were to extend the absentee ballot request deadline. *McDonald* also involved prisoners' access to absentee ballots. In that case, inmates awaiting trial who legally or financially could not be released on bail complained that Illinois did

27

not make absentee ballots available to all registered voters who happened to be incarcerated during the election. *Id*. at 803. At the time of that case, Illinois only provided absentee ballots to specific categories of voters, including physically incapacitated electors and electors who were absent from the county of their residence. There was no specific authorization of absentee ballots for prisoners. *Id*. at 803. As a result, prisoners who were housed in jails outside of the county of their residence were able to request absentee ballots on that basis, but prisoners jailed within the county of their residence had no option to request an absentee ballot. *Id*. at 804–06. The plaintiffs filed suit against the state, alleging that the state violated their equal protection rights by arbitrarily denying them access to absentee ballots. *Id*. at 806. The Supreme Court applied a rational basis standard of review for two reasons. *Id*. at 807. First, the state had not classified the inmates based on race or wealth; and second, because the plaintiffs failed to present any evidence that they would not actually be able vote if not provided with absentee ballots, the Court characterized the right at stake as the right to receive absentee ballots rather than the right to vote. *Id*. Defendants claim that the rights at stake in the instant case are analogous. Ohio's absentee ballot provisions do not in and of themselves distinguish between individuals based on wealth or race. More importantly, according to Defendants, Plaintiffs in this case, like the plaintiffs in *McDonald*, have not set forth evidence demonstrating that Ohio's absentee ballot laws actually impact prisoners' ability to vote. To the contrary, Defendants allege, Ohio offers numerous opportunities for electors, including electors confined in jail, to vote, and electors can start voting by absentee ballot as early as thirty-five days before the election. Although an elector who is arrested after the deadline for requesting an absentee ballot may be prevented as a practical matter from taking advantage of the final days of in-person

voting or from obtaining an absentee ballot, that elector would have had ample opportunity to vote whether in person or by mail prior to being arrested.

Plaintiffs, on the other hand, argue that this Court should apply strict scrutiny because Ohio law severely burdens the voting rights of electors incarcerated after the deadline for requesting absentee ballots by effectively denying these detainees any opportunity to vote. Plaintiffs rely heavily on *O'Brien v. Skinner*, 414 U.S. 524 (1974), a case involving claims nearly identical to those raised in *McDonald*. In O'Brien, detainees who were awaiting trial or serving misdemeanor sentences challenged New York's refusal to allow them to register and vote as absentee voters. *Id*. at 525–27. Like Illinois, New York allowed only specific categories of electors to vote by absentee ballot. Those categories included electors unable to appear personally due to illness or disability and electors who expected to be away from their county of residence on Election Day. *Id*. at 525–26. Accordingly, just as was the case in *McDonald*, inmates incarcerated in their own county of residence were denied absentee ballots. *Id*. at 527–29. The main factor that distinguished *O'Brien* from *McDonald* was that the *O'Brien* plaintiffs presented evidence that in addition to being denied absentee ballots, they were denied any alternative means of casting their vote. *See id.* at 525–26, 529-30. In light of the evidence that New York's election laws effectively barred the plaintiffs from voting, the Supreme Court held that the challenged statutes "operate[d] as a restriction which [was] so severe as itself to constitute an unconstitutionally onerous burden on the . . . exercise of the franchise." *Id*. at 530 (internal citations omitted).

The instant case falls somewhere in between *McDonald* and *O'Brien*. It differs from *McDonald* because Plaintiffs have presented at least some evidence that Ohio law burdens

prisoners' ability to vote during the days prior to the election. Specifically, the testimony of the various boards of elections witnesses revealed that individuals who (i) are arrested during the weekend prior to the election, (ii) are detained through the election, and (iii) failed to take advantage of early voting option prior to their arrest may be effectively denied access to the polls. This case also differs from *O'Brien* in that unlike the statutory scheme at issue in that case, Ohio's election laws do provide alternatives – specifically, early voting options – for individuals who may be incarcerated during the last few days before the election. Accordingly, the *Anderson-Burdick* balancing test is the proper standard to apply to Plaintiffs' equal protection claims. Under that standard, the Court must weigh the character and magnitude of Plaintiffs' alleged injury against the precise interests described by the State as justifications for the burden imposed by the challenged statute.

### b. The Alleged Injury

As Defendants point out, not all individuals arrested during the days prior to the election will be prohibited from voting by Ohio's absentee ballot request deadline. Only a portion of those individuals who are arrested will be registered to vote, and of that portion, some may be released prior to or on Election Day, and others may have voted prior to their arrest. At this early stage of the instant lawsuit, the evidence relied upon by Plaintiffs to demonstrate the potential numbers of electors who may actually be prevented from voting by the absentee ballot deadline imposed under Ohio Revised Code § 3509.08 consists primarily of Mr. Dalence-Gastelu's testimony and the exhibits referenced therein.

Even assuming that Mr. Dalence-Gastelu's statistical analysis is sound, the only inference the Court could make based on that analysis is that approximately forty-four percent of

the people arrested during the weekend prior to the election will be registered to vote. Plaintiffs have submitted no evidence to demonstrate what percentage of those individuals will actually be prevented from voting, given that they will have already had an opportunity during the month prior to the election to request an absentee ballot or to take advantage of Ohio's in-person early voting system. Nor have Plaintiffs submitted any evidence to demonstrate the percentage of those individuals who are likely not only to be arrested during the weekend prior to the election but also detained through the actual election. This case therefore differs from the recent *Obama for America* case, wherein the plaintiffs "introduced extensive evidence that a significant number of Ohio voters [would] in fact be precluded from voting" if the court did not enjoin Ohio from preventing in-person voting during the three days prior to the election. *Obama For America*, 2012 WL 4753397, at *6. That evidence included "statistical studies that estimated approximately 100,000 Ohio voters would choose to vote during the three-day period before Election Day, and that these voters are disproportionately women, older, and of lower income and education attainment." *Id*. (internal quotation omitted). Based in part on that evidence, the court "concluded that the burden on [p]laintiffs was 'particularly high' because their members, supporters, and constituents represent a large percentage of those who participated in early voting in past elections." *See id*.

In the instant case, Plaintiffs have not presented enough evidence to permit this Court to evaluate the potential burden caused by Ohio's absentee ballot request deadlines. It is perhaps safe to assume that at least a few individuals may be unable to vote in the upcoming election as a result of their arrest.[9] However, without additional evidence, that is the farthest leap the Court is

---

[9] The Court notes that it remains unclear whether this burden differs in any meaningful way from the burden suffered by non-incarcerated individuals who may be prevented from

willing to make at this time.

### c.    Ohio's Justifications

The State alleges, and the testimony of the boards of elections representatives demonstrated, that the Ohio Boards of Elections are particularly busy during the period between Friday, November 2, 2012 and the day of the election, Tuesday, October 6, 2012.  During that period, boards administer the last three days of in-person early voting, compile final poll books, process and count absentee ballots, set up polling locations for Election Day, and send board employees out to fulfill requests for absentee ballots made under Ohio Revised Code § 3509.08. It is for that reason, and the need to prevent chaos during the election, that the State has imposed the absentee ballot request deadlines outlined in Ohio Revised Code Ch. 3509.

The State further maintains that its decision to extend the general noon Saturday deadline for requesting an absentee ballot only for the narrow group of individuals described in § 3509.08(B) – those individuals who are hospitalized or whose minor children are hospitalized on Election Day due to an unforeseeable medical emergency – does not violate the equal protections rights of prisoners who remain subject to the deadline set in § 3509.08(A).        According to the State, due to security concerns such as those outlined by Mr. Fisher and to the fact that newly detained individuals are generally moved between the courts and various jails following their arrests,[10] individuals detained during the weekend prior to the election are not similarly situated

---

voting due to unforeseeable circumstances such as a last minute business trip or a death in the family that require those individuals to travel during the election and the weekend prior thereto. These individuals would be subject to the same deadline for requesting absentee ballots by mail as is imposed on inmates.

[10] For testimony regarding the mobile nature of inmates during the first few days of their detention, *see* TRO Hr'g Tr. 155:8–157:4, Doc. 24 at 32–34, Pg. ID # 354–356.

to individuals who have been admitted to a hospital due to medical emergencies. Further, even if the Court were to view those groups as similarly situated, the State maintains that important logistical considerations justify the decision to offer the special accommodation prescribed in Ohio Revised Code § 3509.08(B) only to electors who themselves or whose children are hospitalized and not to other electors who may be prevented, due to a wide variety of circumstances, including an emergency business trip, a death in the family, or an arrest, from voting on Election Day or during the few days prior thereto. Specifically, the State argues, it would be too onerous of a burden to require boards of elections to have to accept requests until 3:00 p.m. from all individuals prevented from voting on Election Day due to unforeseen circumstances.

Even if, as Plaintiffs request, the Court were to only extend the § 3509.08(B) accommodations to prisoners, the evidence suggests that the resultant burden on the boards of elections still may be too onerous. Indeed, if this Court were to grant the injunctive relief that FEO and the other Plaintiffs request, all inmates detained within the county in which they are registered to vote, regardless of the type of jail or holding facility in which they are housed, would be permitted to request an absentee ballot up until 3:00 p.m. on the day of the elections, and the county board of elections would be duty-bound to find a way to send two employees out to deliver those ballots. Even former Secretary of State Brunner, in describing her own expectation of what the boards of elections should be required to do, implicitly acknowledged that the requested relief may be impractical:

> It's never been my understanding that we were trying to apply this to six-hour and 12-hour and those temporary holding facilities. It's always been my understanding that we were – we were going for what was doable, which was people who are incarcerated in the county jail system.

(TRO Hr'g Tr. 214:15–19, Doc. 24 at 91, Pg. ID # 413.)[11]

In light of the fact that Plaintiffs have yet to submit sufficient evidence to allow this Court to effectively gauge the character and magnitude of Plaintiffs' alleged injury, the States' important regulatory interests in setting the above-described absentee voting deadlines appears at this time to justify any burden those deadlines may impose on individuals arrested during the weekend prior to the election. Plaintiffs, therefore, have not demonstrated that they are likely to succeed on the merits of their equal protection claims.

### 2. Procedural Due Process

In addition to alleging equal protection claims, Plaintiffs also claim that the state violates individuals' rights to procedural due process by depriving arrested electors of their right to vote without notice and a meaningful opportunity to be heard. For many of the same reasons discussed above, and in particular due to Plaintiffs' failure to set forth sufficient evidence of the actual injury to electors' rights to vote, Plaintiffs also have not demonstrated a likelihood of success on their procedural due process claim.

### 3. Voting Rights Act Claim

Plaintiffs claim that Ohio Revised Code § 3509.08 violates § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. Section 2 provides that "[n]o voting qualification or prerequisite to

---

[11] Later during her testimony, Ms. Brunner also testified that based on her experience as Secretary of State, she believes that if the State were ordered, one week prior to an election, to extend the deadline for incarcerated individuals to 3:00 p.m. on the day of the election, it would not be too difficult for the State to develop procedures to provide absentee ballots to prisoners through Election Day. It is not clear whether when giving her opinion, Ms. Brunner envisioned the boards of elections having to respond to requests from all levels of jails or only from the full-service county jails. If the former, then the hypothetical she based her opinion on would not match up with the realities of the relief requested. If the latter, then Ms. Brunner's opinion would conflict with her earlier testimony, and therefore carries little weight.

voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. § 1973(a). "Section 2, unlike other federal legislation that prohibits racial discrimination, does not require proof of discriminatory intent." *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002). Rather, to prevail on a claim under § 2 of the Voting Rights Act, a plaintiff need only show that "a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race." *Chisom v. Roemer*, 501 U.S. 380, 394 (1991).

Plaintiffs attempt to prove this claim through statistical evidence demonstrating racial disparities in the rates of arrest and detention in Ohio, arguing that because of those disparities, the disenfranchisement of detainees will abridge the voting rights of a disproportionate percentage of African-American electors. The admissibility of the evidence relied upon by Plaintiffs is questionable, and to the extent the evidence is admissible, it is not sufficient to establish a violation of the Voting Rights Act. *See Wesley v. Collins*, 791 F.2d 1255, 1260–61 (6th Cir. 1986) (evidence that a Tennessee statute that disenfranchised convicted felons disproportionately impacted African Americans because a significantly higher number of African-American Tennesseeans are convicted of felonies than whites was insufficient to establish a Voting Rights Act violation because "a showing of disproportionate racial impact alone does not establish a *per se* violation of the" Act). Because Plaintiffs have not set forth evidence that Ohio's deadline for prisoners to request an absentee ballot has resulted in the denial or abridgment of the right to vote based on color or race, Plaintiffs have not shown a likelihood of success on their Voting Rights Act claim.

35

### 4.        Seventeenth Amendment Claim

Plaintiffs' final claim is that Ohio violates the Seventeenth Amendment of the United States Constitution by denying the right to vote in federal elections.  Plaintiffs provide little if any evidentiary or legal support for this claim, and therefore have not shown a likelihood of success on the merits.

### C.        Equitable Factors

Having determined that Plaintiffs failed to demonstrate a likelihood of success as to any of their claims, the Court turns now to the equitable factors.  As discussed below, those factors also weigh against the issuance of the requested injunctive relief.

### 1.        Delay

Citing *Purcell v. Gonzalez*, the State argues that Plaintiffs' request for injunctive relief should be denied because the election is imminent and there is "inadequate time to resolve the factual disputes" underlying this lawsuit and because Plaintiffs needlessly delayed filing the instant lawsuit.  549 U.S. 1 (2006).  The procedures that Plaintiffs challenge have been the law of Ohio for years.  Ms. Brunner admitted that she enforced those procedures while she served as Secretary of State.  Therefore, at least one of the Plaintiffs in this suit, FEO, was aware of the alleged implications of those procedures long before this lawsuit was filed and could have brought the alleged constitutional violations to the Court's attention at a much earlier date. While delay is not one of the typical factors taken into consideration in the injunctive relief analysis, courts have considered a plaintiff's unnecessary delay in bringing a challenge to a state's election laws when ruling on a motion for injunctive relief filed shortly before an election. *See United States v. City of Philadelphia*, Civil Action No. 2:06cv4592, 2006 WL 3922115, at

*2 (E.D. Pa. Nov. 7, 2006) ("When a plaintiff fails to move promptly in seeking injunctive relief, there is an increased probability that a court order may have a disruptive and deleterious effect.").

At this late stage, the State's interest in ensuring a smooth election process militates against any order that would require potentially onerous last minute changes to the procedures put in place by the State and each of its eighty-eight boards of elections.  Due to the apparently unnecessary delay in filing this lawsuit, the Court is particularly sensitive to that state interest. *See Purcell*, 549 U.S. at 4–5 ("Court orders affecting elections . . . can themselves result in voter confusion . . . . As an election draws closer, that risk will increase."); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief. . . ."); *Service Employees International Union Local 1 v. Husted*, No. 12-4264, Opinion at 5-6 (6th Cir. Oct. 31, 2012) (noting that "as a general rule, last-minute injunctions changing election procedures are strongly disfavored," and finding that, where the claims in question were known to the plaintiffs months prior to the election, the "plaintiffs' failure to act earlier in pursuing [their] claims significantly undermines their assertions of irreparable harm in the absence of the injunction").

2. **Risk of Substantial Harm to the Public and to Defendants if the Requested Relief is Granted**

Closely related to the timing of the filing of this lawsuit and the State's interest in ensuring a smooth election is the fact that in this case, there exists a genuine risk that the Court

may create chaos by issuing the requested relief. This Court is particularly concerned that if it grants Plaintiffs' motion without having had adequate time to explore the possible ramifications to the requested relief, the Court may actually exacerbate existing equal protection concerns or potentially create new violations.

This concern stems from the fact that the noon Saturday deadline for absentee ballot requests imposed under Ohio Revised Code § 3509.08(A) does not only apply to incarcerated individuals. The same deadline also applies to all individuals suffering from an infirmity, disability, or illness that prevents them from traveling to a polling location to vote in person. Section 3509.08(B) extends that noon Saturday deadline only for the narrow subset of people who experience an unforeseeable medical emergency requiring their own or their minor child's hospitalization on the day of the election. Just as Ohio law does not extend the absentee ballot request deadline for individuals incarcerated during the weekend prior to the election, it also does not extend the deadline for individuals who may suffer from an unforeseen illness, disability, or infirmity that prevents them from traveling to the polls but does not require their hospitalization. As indicated above, Plaintiffs have not presented sufficient evidence at this time to demonstrate that incarcerated individuals' equal protection rights are likely violated by the different deadlines imposed under § 3509.08(A) and (B). If the Court were to issue the injunction requested by Plaintiffs and extend the absentee ballot request deadline only as it applies to prisoners, the Court might actually create an equal protection violation where none may have existed under the current statutory scheme.

### 3.    Risk of Irreparable Injury to the Plaintiffs

In comparison, the risk of irreparable injury demonstrated by the evidence before the

Court is slight.  The Court recognizes that to the extent there are any registered electors who are not able to vote in the upcoming election because they do not take advantage of Ohio's early voting options and then are arrested and detained during the weekend prior to the election, their injury will be irreparable.  However, as described above, Plaintiffs have yet to present evidence demonstrating the number of registered electors likely to fall within that category.  Accordingly, the extent of the potential harm is at this point still too speculative.

The harm described by Plaintiffs Fair Elections Ohio and The AMOS Project is largely monetary in nature.  While AMOS's alleged injury was sufficient to establish standing, Plaintiffs have shown only a minor risk of irreparable injury to their organizations' abilities to carry out their stated goals.

## IV.    CONCLUSION

On balance, the factors to consider in evaluating a motion for temporary restraining order weigh against the Plaintiffs in this case.  The Court appreciates the importance of an individual's right to vote and does not view lightly any laws that may burden that right.  However, at this late date, so near in time to a presidential election, the Court also is mindful of the importance of avoiding a rash decision, particularly where that decision would be based on the thinnest of evidence and would require the boards of elections in Ohio to implement last minute changes that have the potential to cause further confusion and violations of voter's rights.  Accordingly, the Court **DENIES** Plaintiffs' Motion for Temporary Restraining Order.

IT IS SO ORDERED.

___s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court