UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

FAIR ELECTIONS OHIO, et al.,    :
                                :   NO. 1:12-CV-00797
        Plaintiffs,             :
                                :
    v.                          :
                                :   **OPINION & ORDER**
JON HUSTED, in his official     :
capacity as Secretary of State  :
of Ohio, et al.,                :
                                :
        Defendants.             :

This matter is before the Court on the parties' cross-motions for summary judgment: Defendants' Motion for Summary Judgment (doc. 109), Plaintiffs' Response in Opposition (doc. 117), and Defendants' Reply (doc. 119); and Plaintiffs' Motion for Summary Judgment (docs. 110, 111, 113), Defendants' Response in Opposition (doc. 116), and Plaintiffs' Reply (doc. 120). For the reasons indicated herein, the Court DENIES Defendants' Motion and GRANTS IN PART Plaintiffs' Motion.

**I. BACKGROUND**

Under Ohio law, jail confinement does not negate voter eligibility. Persons who are in jail on pending charges, whether misdemeanor or felony, for which they are awaiting trial and are not convicted, have the right to register and vote. Ohio Rev. Code § 3509.08(A). Only convicted felons in state custody lose the right to vote, and only during the pendency of their incarceration. Ohio Rev. Code § 2961.01(A). As such, convicted misdemeanants do not lose the right to vote while detained (doc. 113).

Ohio law provides two basic methods by which a registered voter can cast a ballot: by voting in person at an assigned location on election day, or by using one of the "absent voter's ballot procedures" pursuant to Ohio Rev. Code § 3509.   Ohio law and practice provide for five methods of absentee voting.  First one can vote remotely by mail (doc. 111).  Second, one can vote early, in person, at the board of elections or other designated location (<u>Id</u>.).  The final three ways apply to those in "special circumstances," that is overseas uniformed military, those subject to "disability or confinement," or those in "unforeseen hospitalization" (<u>Id</u>.).

For conventional absentee voting, a request must be received by hand delivery before 6:00 P.M. on the Friday before Election Day, or by mail before noon on the Saturday before Election Day at the relevant board of elections.  Ohio Rev. Code § 3509.03.  Those in "special circumstances"  including those confined under a sentence for a misdemeanor or awaiting trial on a felony or misdemeanor, can submit ballot applications up to 90 days before an election.  Ohio Rev. Code § 3509.08(A).  After receiving and verifying confined voter ballot applications, boards of elections send two-person teams to obtain the ballots from those confined at nursing homes, private homes, hospitals, and jails (doc. 113).  While such teams visit nursing homes as long as a month before the election, boards of elections can and do wait until Election Day itself to send a team to the county's jail or

jails, to avoid obtaining absentee ballots from persons who would have been released before Election Day (Id.).

The practical outcome of this current framework means that the Confined Voter procedure is unavailable for a voter who is arrested after 6:00 P.M. on the Friday before Election Day (doc. 113). A registered voter who has not voted early and who falls within such window would not be able to vote unless released in time to vote in person on Election Day (Id.).

The Revised Code provides an exception for late absentee voting in hospitals. Ohio Rev. Code § 3509.08(B). Those who cannot visit the polls in person because the voter or the voter's minor child is "confined in a hospital as a result of an accident or unforeseeable medical emergency" can qualify for a special voting procedure if an absentee ballot application is delivered to the relevant board of elections by 3:00 P.M. on Election Day. Ohio Rev. Code § 3509.08(B)(2). A late hospital voter can request that the absentee ballot be entrusted to a family member for delivery, otherwise, the board must send a two-person team of board employees representing the two major political parties. Ohio Rev. Code § 3509.08(B). No corresponding provision exists for persons confined in jail on Election Day because of an arrest or misdemeanor conviction occurring after 6:00 P.M. the preceding Friday.

This case involves this very small subset of Ohio voters, legally entitled to vote under law, but impeded from doing so by their detention by the state. Plaintiffs contend these voters,

who are "late-jailed electors," that is, taken into custody after 6:00 P.M. on the Friday before election day and held through election day, should be treated similarly to "late-hospitalized electors," to whom the Boards of Elections send out staff to assist with voting pursuant to Ohio Rev. Code §3509.08(B)(1).

In response, Defendants contend that Plaintiff The AMOS Project ("AMOS") lacks standing to bring this action, regardless of the fact that the Court already found such standing. Defendants further argue that the Boards of Elections essentially have too much to do in administering the elections to be able to send out staff to jails to accommodate late-jailed electors. Defendants further contend those in jail are more difficult to access than those in hospitals. Finally Defendants argue the burden on late-jailed electors, who could have voted early under Ohio law, is minimal.

Plaintiffs originally requested emergency injunctive relief, which the Court denied. The Court found the request too close to the actual election date and potentially disruptive to a smooth election process. The Court further found Plaintiffs had not produced evidence demonstrating the number of registered voters likely to fall within the category of "late-jailed" such that the extent of harm was "too speculative."

Plaintiffs proceeded with discovery, and now proffer expert evidence that at least, if not more, than 400 late-jailed voters state-wide were impeded from voting in the 2012 election.

-4-

Indeed, Plaintiffs elicited testimony from a late-jailed elector, Jeffrey Wilkins ("Wilkins"), who fell squarely into the category (doc. 113).  Wilkins testified he refrained from voting absentee because he preferred going to the polls in person (Id.).  In fact, he intended to work as a volunteer on Election Day, at a church in Cheviot (Id.).  Unfortunately, however, Wilkins was arrested following a dispute with his stepson, and was confined at the Hamilton County Justice Center (Id.). Wilkins asked three deputies whether he would be able to vote, and he was ultimately informed in the negative (Id.).  Had his dispute resulted in his hospitalization, Wilkins would have been able to vote (Id.).

Plaintiffs have moved for summary judgment under federal constitutional theories and the Voting Rights Act.  Plaintiffs contend the state law that treats them differently than late-hospitalized electors affects their fundamental right to vote and violates equal protection.   In their motion, Plaintiffs seek permanent injunctive relief to 1) enjoin Defendants from enforcing the deadline for pre-trial detainees and convicted misdemeanants to request absentee ballots, 2) require Defendants to provide a means of voting for all confined voters that is at least equivalent to that provided for hospitalized persons, and 3) require Defendant Husted to notify the 88 county Boards of Elections of the rights of confined voters and to direct such Boards regarding the means by which such rights are to be effected and enforced (doc. 112).

Both Plaintiffs and Defendants have now moved for summary

-5-

judgment, contending respectively that they are entitled to judgment as a matter of law.  The cross-motions have been fully briefed such that this matter is ripe for the Court's consideration.

## II. STANDARD

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992)(per curiam).  In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled.  First, "a party seeking summary judgment. . . bears the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252;

see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of his claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989)(internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F .2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating

-8-

that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991).

## III. DISCUSSION

### A. Standing

Defendants devote substantial argument in attack of Plaintiffs' standing to bring this suit, contending that AMOS, an association of religious congregations in the Cincinnati area, cannot establish independent standing or organizational standing (doc. 109). The Court already found that AMOS has standing, based on the allegation that it was forced to divert its limited resources from its get-out-the-vote efforts to providing additional training for canvassers regarding the effects of arrest, increasing efforts in neighborhoods with higher arrest rates, and informing voters in at-risk areas that if they don't vote early and are subject to arrest, they could be unable to vote (doc. 30, citing Florida State Conference of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1165-66 (11th Cir. 2008)). The Court noted that the injury, however small in scale "is imminent, fairly concrete, is traceable to the challenged absentee ballot deadline, and is redressable" so as to sufficiently establish standing (Id.).

Plaintiffs cite in their briefing a point-by-point

-9-

analysis of the deposition testimony of the CEO of AMOS, Paul Graham, and "invite and encourage the Court simply to compare Defendants' characterizations with the actual testimony cited and draw its own conclusions" (fn.2, doc. 117). The evidence shows AMOS learned of the disenfranchisement of late-jailed voters late in the game, and therefore weren't able to modify voting rights placards or print new supplemental materials (<u>Id</u>.). The evidence further shows that AMOS used its small staff in voter engagement training to teach election volunteers that a pre-election arrest could result in the loss of the chance to vote (<u>Id</u>.). Having reviewed this matter, and having compared Defendants' characterizations with actual testimony, the Court concludes the facts show AMOS diverted limited resources to address the issue of late-jailed electors, and thus retains standing to sue on the question.

**B.    Equal Protection**

As an initial matter, the parties differ as to what standard should apply to Plaintiffs' equal protection claim: whether strict scrutiny, because voting is a fundamental right; or whether <u>Anderson-Burdick</u> balancing of interests applies due to inequal treatment of voters. The Court previously applied <u>Anderson-Burdick</u> balancing in its consideration of Plaintiffs' motion for a temporary restraining order because it found elections laws provided for early voting options as an alternative for late-jailed electors (doc. 30). It therefore found it appropriate to "weigh the character and magnitude of Plaintiffs' alleged injury against the precise

-10-

interests described by the State as justifications for the burden imposed by the challenged statute" (Id.).  It would appear then that the Court's judgment that such balancing test applies is law-of-the-case.[1]

The character and magnitude of Plaintiffs' alleged injury is the complete deprivation of the voting rights of late-jailed voters.  It is immaterial whether this subset of voters is small in number, (although the fact that they are small in number militates strongly against the state's apparent argument that accommodating late-jailed voters is somehow very burdensome).  Plaintiffs have proffered persuasive authority for the proposition that it is not an "ill-defined numerical threshold" but rather "the severity of the burden on a cognizable subset of voters" that is the proper focus of the Court's analysis (doc. 117, citing Crawford v. Marion County Election Board, 553 U.S. 181, 197-98 (2008)(plurality); Anderson v. Celebreeze, 460 U.S. 780, 782 (1983)(focusing on rights of Anderson

---

[1]The Court notes that the law-of-the-case doctrine very well may not apply to factual questions previously before the Court in the context of a proceeding for a preliminary injunction.  The Court previously made a factual determination that "Ohio's election laws do provide alternatives–specifically early voting options–for those who may be incarcerated during the last few days before the election."  Plaintiffs however, have indisputably established that those who had not yet voted and are taken into custody after 6:00 P.M. on the Friday before the election, and are held until after the election, have no available "alternative" to vote.  They simply cannot vote.  Here, in dicta, the Court has a tendency to agree with Plaintiffs that where such a fundamental right is completely taken away, strict scrutiny should apply.  However, out of deference to the previous finding, the Court will apply the less stringent balancing test.  Under either standard, the Court finds Plaintiffs ultimately prevail.

supporters); <u>Northeastern Ohio Coalition for the Homeless v. Husted</u>, 696 F.3d 580, 593 (6th Cir. 2012)(identifying a substantial burden on provisional voters despite State's argument that less than .248% of ballots in 2008 election were affected); <u>Hunter v. Hamilton County Bd. Of Elections</u>, 635 F.3d 219, 237 (6th Cir. 2011)(recognizing an Equal Protection violation when 269 ballots were invalidated in November 2010 election for Hamilton County Juvenile Court Judge)).  Here there is no dispute that late-jailed voters are completely deprived of the right to vote.  Defendants have not demonstrated that Plaintiffs' methodology in arriving at 400 plus affected-voters through extrapolation is incorrect.  Taking into account the above authorities, and noting that there is no dispute in this case that the statutory framework works to completely bar late-jailed electors from voting, the Court is of the mind that even if one voter in an election cycle, Jeffrey Wilkins, is deprived of his voting right, there is an actionable Equal Protection violation.

Defendants in this case attempt to re-frame the matter as if Plaintiffs are challenging the generally-applicable deadline for absentee voters.  To whatever extent that may have been true, it appears from Plaintiffs' briefing that they focus now only on those late-jailed electors for whom there is no question regarding deprivation of voting rights.

The Court notes that the generally-applicable deadline would apply to others in state custody who were jailed before the Friday 6:00 P.M. deadline.  As such, there should be no real concern

-12-

on the part of Defendants that Plaintiffs' requested relief opens the floodgates to some chaotic last-minute stampede by jailed voters. Indeed, despite Defendants' general argument the boards of elections have too much to do already, the record shows they are already sending their two-person teams to jails on Election Day anyway, to enable confined eligible voters who submitted requests prior to the generally-applicable deadline. In the Court's view, it is clear that assisting the few extra qualified voters who were confined after the Friday 6:00 P.M. deadline could not be an onerous extra burden. The record shows that most counties do not even have people who fall into this narrow exception, and the larger counties should have the capacity to deal with it. As such, when balancing the "character and magnitude of the asserted rights protected by the First and Fourteenth Amendments that the plaintiff[s] seek to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed," Burdick v. Takushi, 504 U.S. 428 at 434 (1992)(quoting Anderson v. Celebreeze, 460 U.S. 780 at 789 (1983), Plaintiffs prevail. The Court cannot find the balance to weigh in favor of Defendants where Plaintiffs' fundamental voting right is simply stripped away, and where whatever additional burden in accommodating late-jailed electors appears minimal at best.

The Court further finds late-jailed electors are similarly-situated to late-hospitalized electors whom the boards of election already accommodate. The boards of election teams should have no trouble locating late-jailed electors, as they literally

have a captive audience.    The Court finds Defendants' concerns
regarding security simply overblown.    Jail staff are competent to
assist in the efficient voting of those within their custody.

        Plaintiffs' final equal protection theory is that late-
jailed voters are subjected to an unconstitutional wealth-based
voting restriction (docs. 112, 120).    Plaintiffs contend that many
late-jailed voters remain detained because of an inability to post
bond, and therefore they are treated differently than those who can
post bond, and who then can vote (Id.).    Defendants respond that
there is no basis to compare the situation here to Harper v. Va.
State Bd. Of Elections, 383 U.S. 663, 670 (1996), which involved a
poll tax (doc. 116).    However Plaintiffs reply that other cases
since Harper have consistently reaffirmed that even indirect voting
restrictions based on payment of money cannot survive constitutional
scrutiny (doc. 120).    Plaintiffs cite Crawford, 553 U.S. at 198
(2008), and Boustani v. Blackwell, 460 F.Supp. 2d 822, 826 (N.D.
Ohio 2006), where Courts invalidated state-required photo
identification that cost a fee to obtain, and invalidated a
requirement to proffer certificates of naturalization because of a
replacement fee (doc. 20).    The Court agrees with Plaintiffs.
Here, although indirect, the financial barrier is real for those who
cannot afford to post bond.    Those detainees who can post bond can
also vote, whereas those who cannot, cannot.    As such, Ohio's
denial of the ability to vote to late-jailed electors acts as an
unconstitutional wealth-based voting restriction.

-14-

## C.    Procedural and Substantive Due Process

Plaintiffs also assert claims based on theories of procedural and substantive due process.  Plaintiffs contend that voting is a fundamental right protected by due process (doc. 112, citing Carrington v. Rash, 380 U.S. 89, 96 (1965), Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).  Indeed, "[N]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined."  (doc. 112, quoting Wesberry v. Sanders, 376 U.S. 1, 17 (1964).

Defendants do not contest that voting is fundamental, but rather, as in their equal protection analysis, contend that Plaintiffs had the alternative of early voting, and that deadlines are necessary for the smooth process of elections.  Defendants further argue that Ohio voters are given sufficient notice that if they do not submit a ballot request by noon on Saturday they will not be able to vote absentee.  Due process, they contend, is not so inflexible so as to prevent a state from imposing normal and reasonable deadlines (doc. 109, citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).  In Defendants' view, being jailed creates a practical barrier to voting, not a legal one—and special procedures to enable such voters are not required to satisfy due process.

The Court disagrees.  Here, voters are being deprived by state action of a fundamental right.  As explained above, the Court does not find it an onerous burden for the government to ensure

-15-

late-jailed electors vote. The Court finds no compelling
justification for the state to deprive these electors from the right
to vote. As such, the Court finds both procedural and substantive
due process violations.

**D.    Voting Rights Act**

Plaintiffs' next theory is that Ohio violates Section 2
of the Voting Rights Act by disproportionately disenfranchising
qualified African-American electors. Such section bars voting
practices that have a discriminatory impact or intent. 42 U.S.C.
§ 1973. The provision may be violated without proof of
discriminatory intent. <u>Chisom v. Roemer</u>, 501 U.S. 380, 394 (1991).
To prevail on their claim, Plaintiffs must show "that a challenged
election process has resulted in the denial or abridgment of the
right to vote based on color or race." <u>Id</u>.

Plaintiffs here proffer expert testimony that more than
half of the late-jailed electors in the November 2012 election were
African-American, while only twenty percent of the sampled counties
are composed of African-Americans. Moreover, they contend that 38%
of Ohio's jailed population is African-American, while African
Americans comprise only 11.4% of Ohio's overall population. Section
2 is violated, they contend, because the disenfranchisement of late-
jailed electors disproportionately affects African-Americans.

Defendants, in response, question the validity of
Plaintiffs' statistical data (doc. 109). Further, citing <u>Wesley v.
Collins</u>, 791 F.2d 1255, 1260-61 (6th Cir. 1986), Defendants argue
that a showing of disproportionate racial impact alone does not

establish a <u>per</u> <u>se</u> violation of the Act (doc. 30).

A closer look at <u>Wesley</u>, however, shows that when a Court finds disproportionate racial impact, its inquiry should be directed in the interaction of the challenged legislation "with those historical, social and political factors generally probative of dilution." <u>Wesley</u>, 791 F.3d at 1261, <u>quoting</u> <u>Gingles v. Edmisten</u>, 590 F. Supp. 345 at 354 (E.D.N.C. 1984). At issue in the Wesley case was whether felons in Tennessee were disenfranchised because of race. The Court found that states have historically disenfranchised felon voters, and are authorized to do so under Section 2 of the Fourteenth Amendment. <u>Wesley</u>, 791 F.2d at 1261. The Court found the Tennessee legislature did not deny the franchise based on race, but rather because the voters had committed serious crimes. <u>Id</u>. at 1262.

In this case, the disenfranchised voters are not convicted felons, and there is no dispute they have the right to vote. The legislative scheme that distinguishes late-jailed voters from late-hospitalized voters arose in the early 1970's. There is no genuine dispute that African-Americans are disproportionately affected by this policy which arose in the wake of the Civil Rights movement. Under these circumstances, the Court finds the "historical, social and political factors generally probative of dilution," that is, that the African-American voters have been barred from voting in violation of Section 2 of the Voting Rights Act.

-17-

**E.    The Seventeenth Amendment**

Plaintiffs' final theory is that the state violates Article 1, Section 2 and the Seventeenth Amendment of the Constitution by denying the right to vote in federal elections (doc. 112). Plaintiffs contend that as they are entitled to vote under Ohio law, Article 1, Section 2 of United States Constitution guarantees them the right to vote for members of the House of Representatives (Id.). Similarly, the Seventeenth Amendment guarantees the right of electors to vote for members of the United States Senate (Id.). By denying late-jailed electors the franchise, Plaintiffs argue Ohio voting procedures violate these provisions of the United States Constitution (Id. citing U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779 (1994)(holding that state statute prescribing qualifications for federal congressional candidates violates Article 1 of the Constitution)).

Defendants respond that in their view the absentee ballot request deadline "does not implicate this right because it does not establish an electoral system whereby Congressional members are selected by a process other than popular election" (doc. 116). Defendants contend the absentee ballot deadline is a procedural regulation of the election process, an appropriate exercise of the States' power to regulate the time, place, and manner of elections (Id.).

The Court agrees with Plaintiffs that it is a matter of federal constitutional law to vote in an election for members of Congress. Wiley v. Sinkler, 179 U.S. 58, 62-65 (1900); Ex parte

<u>Yarbrough</u>, 110 U.S. 651, 661-664 (1884).  The Court further agrees that the state applied Ohio Revised Code § 3509.08 in such a way so as to prevent qualified electors from exercising their rights to vote for Senators and Representatives.  As such, Plaintiffs are entitled to judgment on this claim, as a matter of law.

**IV.  CONCLUSION**

Having reviewed this matter, the Court concludes that Plaintiffs have standing and prevail under the theories they allege that late-jailed electors are currently barred from voting, in violation of federal law.  The Court sees no value in taking away this fundamental voting right, even for a short period of time.

Moreover, the Court finds that boards of elections are going to the jails already, so as to assist absentee voters who submitted their requests prior to 6:00 P.M. on the Friday before the election.  Any additional burden on the state by additional voters jailed after such time is simply minimal.

Accordingly the Court GRANTS Plaintiffs' Motion for Summary Judgment (doc. 110) to the extent that it ENJOINS Defendants from treating late-jailed electors any differently from late-hospitalized electors.  As such, if an elector is taken into state custody after 6:00 P.M. on the Friday before Election Day, such an elector should be entitled to absentee voting assistance until 3:00 P.M. on Election Day if "[t]he elector is confined in a county jail as a result of an unforeseeable arrest or misdemeanor sentence of incarceration occurring before the election."  The Court further DENIES Defendants' Motion for Summary Judgment (doc. 109).  This

matter is dismissed from the Court's docket.

       SO ORDERED.


Dated: September 16, 2014    <u>s/S. Arthur Spiegel</u>
                            S. Arthur Spiegel
                            United States Senior District Judge